**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

JENIFFER BEDA, individually and on
behalf of all others similarly situated,

                      Plaintiff,

      -against-

THE NURTURY AT FLANDREAU, INC., THE
NURTURY OF LARCHMONT, INC., THE
NURTURY MONTESSORI AT NORTH
AVENUE, LLC, BRIANNA BANAHAN, and
CATHLEEN BILLONE a/k/a CATHY BILLONE,

                     Defendants.

-------------------------------------------------------------X

Case No.



**CLASS AND COLLECTIVE
ACTION COMPLAINT**


**Jury Trial Demanded**

Plaintiff Jeniffer Beda ("Beda" or "Plaintiff") alleges on behalf of herself and all others

similarly situated, against Defendants The Nurtury at Flandreau, Inc. ("Flandreau"), The Nurtury

of Larchmont, Inc. ("Larchmont"), The Nurtury Montessori at North Avenue, LLC ("North

Avenue") (Flandreau, Larchmont, and North Avenue, collectively, "Nurtury"), Brianna Banahan

("Banahan"), and Cathleen Billone a/k/a Cathy Billone ("Billone"), (Nurtury, Banahan, and

Billone, collectively, "Defendants"), upon information and belief, as follows:

## NATURE OF THE CLAIMS

1.  Beda complains, on behalf of herself and all others similarly situated, pursuant to Title VII of

    the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.*, ("Title VII") and the New York

    State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.*, ("NYSHRL"), seeking damages to

    redress the harm she and other similarly situated employees, including Assistant Teachers and

    Teachers of non-American national origin ("non-American employees"), have suffered and

    continue to suffer as a result of Defendants' discriminatory policies and practices subjecting

them to discriminatory disparate treatment and a hostile work environment by their former employers on the basis of their **national origin**.

2.  Beda further complains, on behalf of herself, that Defendants discriminated against her and subjected her to a hostile work environment on the basis of her **sex/gender** and that Defendants retaliated against her after she complained of their discriminatory conduct, in violation of Title VII and the NYSHRL.

3.  The Federal and New York State anti-discrimination and anti-retaliation laws are intended to afford all employees the same rights, regardless of their national origin or sex/gender, and provide them with the dignity and respect they deserve in the workplace.  As such, this is an action for declaratory, injunctive, and monetary relief to redress Defendants' unlawful employment practices, including unlawful discrimination and retaliation committed against the Plaintiff.

4.  Beda further complains pursuant to the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 State. 178 ("FFCRA") and the Emergency Paid Sick Leave Act, FFCRA §§ 5102, *et seq.*, ("EPSLA"), seeking relief for Defendants' unlawful actions, including compensation for Defendants' failure to provide Beda paid time off for 80 hours of Coronavirus sick leave and for retaliating against Beda after and as a result of her attempts to assert her rights under the aforementioned statutes.

5.  Additionally, Beda complains, on behalf of herself and all others similarly situated, pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201, *et seq.*, ("FLSA") and the New York Labor Law §§ 190, *et seq.*, ("NYLL") that Defendants maintained a pattern and practice of failing to pay her and other non-exempt employees, including Assistant Teachers and Teachers, at least the applicable minimum wage for all hours they worked, the overtime rate

of one-and-one half (1 ½) times the regular hourly rate/applicable minimum wage rate for all hours worked in excess of forty per week, and, pursuant to the NYLL, spread-of-hours pay for each workday their shift or shifts exceeded 10 hours per day.

6. Defendants regularly paid Beda and other Assistant Teachers and Teachers a flat hourly rate for all hours worked in the classroom—which fluctuated week to week—usually in cash or through a payment application.  Defendants did not pay Beda and other Assistant Teachers and Teachers for any hours worked outside of the classroom and did not pay the overtime premium for hours worked over forty hours per week.  Defendants further failed to pay Beda and similarly situated employees spread-of-hours pay for each workday in which her shift or shifts exceeded 10 hours.  Additionally, despite setting Beda's and the other Assistant Teachers' and Teachers' payday semi-monthly—on the 15th and 30th of each month—Defendants regularly failed to promptly pay Beda and the other Assistant Teachers and Teachers.  This payroll scheme is an obvious and willful avoidance of Defendants' obligation to pay minimum wage and overtime and to promptly pay wages, as required under state and federal law, and spread-of-hours pay under state law.

7. Defendants also failed to furnish Beda and similarly situated employees with wage notices and complete and accurate wage statements with each payment of wages and further failed to maintain an accurate record keeping of hours worked and wages paid to Beda and similarly situated employees.

8. Defendants have systematically and repeatedly ignored the requirements of the FLSA and NYLL.  Plaintiff, on behalf of herself and similarly situated employees, seeks relief for Defendants' unlawful actions, including compensation for unpaid minimum wages, overtime wages, spread-of-hours pay, liquidated damages, pre- and post-judgment interest, statutory

damages for Defendants' notice violations, and attorney's fees and costs, pursuant to the FLSA and NYLL.

9. Defendants further violated the FLSA and NYLL with respect to Beda's employment by retaliating against her after and because she complained of Defendants' unlawful pay practices, for which she seeks lost wages, liquidated damages, pre-and post-judgment interest, and attorney's fees and costs under the FLSA and NYLL.

10. Federal and state wage and hour laws are designed to protect workers from exploitation by their employers and to disincentivize employers from maintaining economically coercive working conditions.  As such, Beda seeks in this action declaratory, injunctive, and monetary relief to redress Defendants' unlawful pay practices to which she was subjected during her employment.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331, 1343(3), and 1343(4).  This Court has supplemental jurisdiction over Plaintiff's claims under city and state law pursuant to 28 U.S.C. § 1367(a), in that the state and federal claims arise from a common nucleus of operative fact such that they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

12. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

13. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## EXHAUSTION OF REMEDIES

14. On or about August 16, 2021, Plaintiff duly filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge Number 520-2021-04329.

15. On March 16, 2022, the EEOC uploaded Plaintiff a Notice of Right to Sue, dated March 11, 2022, to the EEOC portal, terminating its processing of the Charge of Discrimination making no determination on the merits of the Charge.

16. Neither Plaintiff nor Plaintiff's counsel became aware of the EEOC's issuance of the Right to Sue Notice until March 16, 2022, when Plaintiff's counsel received an email from the EEOC indicating a document had been uploaded to the Portal with respect to Beda's EEOC Charge of Discrimination.

17. However, Plaintiff's counsel (and, upon information and belief, the general public) was unable to access the EEOC portal due to technical issues with the EEOC portal, and Plaintiff's counsel immediately notified the EEOC Investigator assigned to Beda's Charge of Discrimination that the portal could not be accessed, requesting a copy of the uploaded document.

18. On March 16, 2022, the EEOC Investigator assigned to Beda's Charge of Discrimination emailed Plaintiff's counsel with a .pdf version of Plaintiff's Notice of Right to Sue.

19. The EEOC did not communicate Plaintiff's Notice of Right to Sue to her or to her counsel— and neither Plaintiff nor Plaintiff's counsel was otherwise aware of the EEOC's issuance of her Notice of Right to Sue—prior to March 16, 2022.

20. Plaintiff has exhausted her administrative remedies and files this complaint within 90 days of the EEOC's issuance of his Notice of Right to Sue, satisfying all procedural prerequisites for bringing this action.

## PARTIES

**Plaintiff Beda**

21. At all times during her employment with Defendants, Beda was a resident of Westchester County, New York.

22. At the time of the filing of this action, Beda is a resident of Westchester County, New York.

23. At all times relevant to this action, Beda was and is a woman.

24. At all times relevant to this action, Beda was and is of Brazilian national origin.

25. From on or around September 4, 2019, until on or around November 29, 2020, Beda was employed by Defendants in various childcare and quasi-teaching capacities.

26. At all times relevant to this action, Beda was an employee of Defendants within the meaning of all applicable statutes.

**Defendant Flandreau**

27. At all times relevant to this action, Flandreau was and is a domestic business corporation duly organized and existing under and by virtue of the laws of the State of New York.

28. At all times relevant to this action, Flandreau was and is a for-profit entity authorized to operate in the State of New York.

29. At all times relevant to this action, Flandreau operated as a Montessori school, providing daycare services and educational instruction to children from ages thirty-six (36) months to six (6) years old.

30. At all times relevant to this action, Flandreau was owned and/or operated by Banahan and Billone as part of a network of Montessori schools, which included the Nurtury Defendants.

31. At all times relevant to this action, Flandreau was engaged in the operation of a preschool and/or elementary school as defined by the FLSA.

32. Due to its operation of a preschool and/or elementary school, at all times relevant to this action, Flandreau was an enterprise engaged in commerce or in the production of goods for commerce pursuant to 29 U.S.C. § 203(s)(1)(B).

33. As a result, at all times relevant to this action, Flandreau was a covered enterprise within the meaning of the FLSA.

34. At all times relevant to this action, Flandreau runs/operates a school (the "Flandreau School") at the premises designated and/or more commonly known as 130 Flandreau Avenue, New Rochelle, New York 10804.

35. At all times relevant to this action, Flandreau maintains an office located at the premises designated and/or more commonly known as 130 Flandreau Avenue, New Rochelle, New York 10804.

36. At all times relevant to this action, Beda was an employee of Flandreau within the meaning of all applicable statutes.

37. At all times relevant to this action, Flandreau was an employer of Beda within the meaning of all applicable statutes.

**Defendant Larchmont**

38. At all times relevant to this action, Larchmont was and is a domestic business corporation duly organized and existing under and by virtue of the laws of the State of New York.

39. At all times relevant to this action, Larchmont was and is a for-profit entity authorized to operate in the State of New York.

40. At all times relevant to this action, Larchmont operated as a Montessori school, providing daycare services and educational instruction to children from ages twelve (12) weeks to thirty-six (36) months old.

41. At all times relevant to this action, Larchmont was owned and/or operated by Banahan and Billone as part of a network of Montessori schools, which included the Nurtury Defendants.

42. At all times relevant to this action, Larchmont was engaged in the operation of a preschool and/or elementary school as defined by the FLSA.

43. Due to its operation of a preschool and/or elementary school, at all times relevant to this action, Larchmont was an enterprise engaged in commerce or in the production of goods for commerce pursuant to 29 U.S.C. § 203(s)(1)(B).

44. As a result, at all times relevant to this action, Larchmont was a covered enterprise within the meaning of the FLSA.

45. At all times relevant to this action, Larchmont runs/operates a school (the "Larchmont School") at the premises designated and/or more commonly known as 11 North Brook Road, Larchmont, New York 10538.

46. At all times relevant to this action, Larchmont maintains an office located at the premises designated and/or more commonly known as 130 Flandreau Avenue, New Rochelle, New York 10804.

47. At all times relevant to this action, Beda was an employee of Larchmont within the meaning of all applicable statutes.

48. At all times relevant to this action, Larchmont was an employer of Beda within the meaning of all applicable statutes.

**Defendant North Avenue**

49. At all times relevant to this action, North Avenue was and is a domestic business corporation duly organized and existing under and by virtue of the laws of the State of New York.

50. At all times relevant to this action, North Avenue was and is a for-profit entity authorized to operate in the State of New York.

51. At all times relevant to this action, North Avenue operated as a Montessori school, providing daycare services and educational instruction to children from ages twelve (12) weeks to thirty-six (36) months old.

52. At all times relevant to this action, North Avenue was owned and/or operated by Banahan and Billone as part of a network of Montessori schools, which included the Nurtury Defendants.

53. At all times relevant to this action, North Avenue was engaged in the operation of a preschool and/or elementary school as defined by the FLSA.

54. Due to its operation of a preschool and/or elementary school, at all times relevant to this action, North Avenue was an enterprise engaged in commerce or in the production of goods for commerce pursuant to 29 U.S.C. § 203(s)(1)(B).

55. As a result, at all times relevant to this action, North Avenue was a covered enterprise within the meaning of the FLSA.

56. At all times relevant to this action, North Avenue runs/operates a school (the "North Avenue School") at the premises designated and/or more commonly known as 1146 North Avenue, New Rochelle, New York 10804.

57. At all times relevant to this action, North Avenue maintains an office located at the premises designated and/or more commonly known as 130 Flandreau Avenue, New Rochelle, New York 10804.

58. At all times relevant to this action, Beda was an employee of North Avenue within the meaning of all applicable statutes.

59. At all times relevant to this action, Larchmont was an employer of North Avenue within the meaning of all applicable statutes.

**Defendant Banahan**

60. Banahan, upon information and belief, was and is a resident of the State of New York.

61. At all times relevant to this action, Banahan served as a principal, offer, owner, and/or manager of the Nurtury Defendants.

62. Upon information and belief, Banahan was a co-founder of the Nurtury Defendants.

63. At all times relevant to this action, Banahan possessed an ownership interest in the Nurtury Defendants and exercised operational control over, policy making authority at, and significant authority over the day-to-day operations of the Nurtury Defendants.

64. For the duration of Plaintiff's employment with Defendants, Banahan was Plaintiff's supervisor and/or manager.

65. At all times relevant to this action, Banahan possessed and exercised the power and authority to hire and fire employees of the Nurtury Defendants, establish their rate and method of pay, determine work schedules, control labor relations and create, modify, and enforce personnel policies, maintain employment records, determine and administer discipline, evaluate employee performance, assign tasks and responsibilities, grant or deny requests for sick/vacation time, and otherwise establish, control, and modify the terms and conditions of employment of Plaintiff, the Title VII Collective and the Rule 23 Class of non-American employees, and the FLSA Collective and the Rule 23 Class of non-exempt employees.

66. At all times relevant to this action, employees of the Nurtury Defendants could complain to Banahan directly regarding any of the terms of their employment, and Banahan would have the authority to effect any changes to the quality, terms, and conditions of their employment.

67. The acts of the Nurtury Defendants charged in this Complaint were authorized, directed, or accomplished by Banahan individually, by herself or her agents, officers, employees or representatives, while actively engaged in the management of the Nurtury Defendants.

68. Banahan is personally jointly and severally liable for the Nurtury Defendants' violations of the FLSA, FFCRA, and NYLL with respect to the employment of Plaintiff, the FLSA Collective, and the Rule 23 Class of non-exempt employees.

69. Banahan is further personally jointly and severally liable for the Nurtury Defendants' violations of the NYSHRL with Plaintiff and the Rule 23 Class of non-American employees.

**Defendant Billone**

70. Billone, upon information and belief, was and is a resident of the State of New York.

71. At all times relevant to this action, Billone served as a principal, offer, owner, and/or manager of the Nurtury Defendants.

72. Upon information and belief, Billone was a co-founder of the Nurtury Defendants.

73. At all times relevant to this action, Billone possessed an ownership interest in the Nurtury Defendants and exercised operational control over, policy making authority at, and significant authority over the day-to-day operations of the Nurtury Defendants.

74. For the duration of Plaintiff's employment with Defendants, Billone was Plaintiff's supervisor and/or manager.

75. At all times relevant to this action, Billone possessed and exercised the power and authority to hire and fire employees of the Nurtury Defendants, establish their rate and method of pay, determine work schedules, control labor relations and create, modify, and enforce personnel policies, maintain employment records, determine and administer discipline, evaluate employee performance, assign tasks and responsibilities, grant or deny requests for

sick/vacation time, and otherwise establish, control, and modify the terms and conditions of employment of Plaintiff, the Title VII Collective and the Rule 23 Class of non-American employees, and the FLSA Collective and the Rule 23 Class of non-exempt employees.

76. At all times relevant to this action, employees of the Nurtury Defendants could complain to Billone directly regarding any of the terms of their employment, and Billone would have the authority to effect any changes to the quality, terms, and conditions of their employment.

77. The acts of the Nurtury Defendants charged in this Complaint were authorized, directed, or accomplished by Billone individually, by herself or her agents, officers, employees or representatives, while actively engaged in the management of the Nurtury Defendants.

78. Billone is personally jointly and severally liable for the Nurtury Defendants' violations of the FLSA, FFCRA, and NYLL with respect to the employment of Plaintiff, the FLSA Collective, and the Rule 23 Class of non-exempt employees.

79. Billone is further personally jointly and severally liable for the Nurtury Defendants' violations of the NYSHRL with Plaintiff and the Rule 23 Class of non-American employees.

**Defendants are Joint Employers of Plaintiff, the Title VII Collective, the Rule 23 Class of Non-American Employees, the FLSA Collective, and the Rule 23 Class of Non-Exempt Employees**

80. At all times relevant to this action, and as a matter of economic reality, Defendants were employers and/or joint employers of Plaintiff within the meaning of Title VII, NYSHRL, FFCRA, FLSA, and NYLL.

81. At all times relevant to this action, and as a matter of economic reality, Defendants were employers and/or joint employers of the Title VII Collective and the Rule 23 Class of non-American employees within the meaning of Title VII and the NYSHRL.

82. At all times relevant to this action, and as a matter of economic reality, Defendants were

employers and/or joint employers of the FLSA Collective and the Rule 23 Class of non-exempt employees within the meaning of the FLSA and NYLL.

83. Facts that demonstrate that Defendants were employers of Plaintiff, the Title VII Collective and Rule 23 Class of non-American employees, and the FLSA Collective and Rule 23 Class of non-exempt employees include:

    a. Defendants all suffered or permitted Plaintiff and similarly situated employees to work.

    b. Each of the Defendants acted directly or indirectly in the interest of one another in relation to Plaintiff and similarly situated employees.

    c. Defendants all simultaneously benefitted from the work of Plaintiff and similarly situated employees.

    d. Defendants each had either functional and/or formal control over the terms and conditions of the work of Plaintiff and similarly situated employees.

    e. Plaintiff and similarly situated employees performed work integral to each Defendant's operation.

    f. Each Defendant had substantial control over the working conditions of Plaintiff and similarly situated employees and over the unlawful policies and practices alleged herein.

84. Defendants' operations were interrelated and unified.

85. Defendants shared a common management and was centrally controlled and/or owned by Defendants.

86. For the duration of Plaintiff's and similarly situated employees' employment with Defendants, the Nurtury Defendants were owned by Banahan and Billone.

87. For the duration of Plaintiff's and similarly situated employees' employment with Defendants, Banahan and Billone jointly oversaw the operations of the Nurtury Defendants.

88. For the duration of Plaintiff's and similarly situated employees' employment with Defendants, Banahan and Billone could and did direct employees, including Plaintiff to perform work at any one of the Montessori schools under their ownership and/or operational control, including any of the Nurtury Defendants.

89. When Plaintiff and other similarly situated employees were directed by Banahan or Billone to perform work at any one of the Montessori schools under their ownership and/or operational control, including any of the Nurtury Defendants, the terms and conditions of the employees' employment remained the same, regardless of the school at which they worked.

90. At all times relevant to this action, at Banahan's and Billone's direction, the Montessori schools under their ownership and/or operational control—including the Nurtury Defendants— interchangeably shared resources, such as employee personnel, books, art supplies, and furniture, based upon the need of any individual entity, for the collective economic benefit of all Defendants.

91. At all times relevant to this action, students at the Montessori schools under Banahan's and Billone's ownership and/or operational control—including the Nurtury Defendants—could and, at times, did, switch between attending any of the Montessori schools under Banahan's and Billon's ownership and/or operational control.

92. At all times relevant to this action, Banahan and Billone operated the Montessori schools under their ownership and/or operational control—including the Nurtury Defendants—from a centralized office, located at 130 Flandreau Avenue, New Rochelle, New York 10804.

93. Upon information and belief, Defendants maintained the records, such as employment records and student/client records, of the Montessori schools under their ownership and/or operational

control—including the Nurtury Defendants—in the centralized office located at 130 Flandreau Avenue, New Rochelle, New York 10804.

94. At all times relevant to this action, at Banahan's and Billone's direction, the Montessori schools under their ownership and/or operational control—including the Nurtury Defendants— maintained uniform policies and procedures set and/or modified by Banahan and/or Billone, such as policies and procedures governing employee compensation and employee conduct.

## TITLE VII COLLECTIVE ALLEGATIONS

95. Plaintiff brings claims for relief as a collective action pursuant to Title VII, 42 U.S.C. §§ 2000(e), *et seq.*, on behalf of all non-American employees of Defendants employed by Defendants at any time from three years prior to the filing of this action through the entry of judgment in this action.

96. The Title VII Collective consists of approximately sixty (60) similarly situated current and former non-American employees of Defendants, who have been victims of Defendants' common policy and practices that have violated their rights under Title VII, *inter alia*, as a result of Defendants subjecting them to inferior terms and conditions of employment, including, but not limited to intentionally seeking out and selecting non-American employees for Defendants' exploitative employment practices such as pay practices, forcing non-American employees to work in unsafe working conditions, and verbally abusing and hypercriticizing non-American employees.

97. Defendants subjected Plaintiff and other non-American employees to the aforementioned exploitative employment practices because, *inter alia*, due to their immigration statuses, lack of resources, lack of connections within the United States, and dependence on Defendants for income, employment, and housing, they were less likely to complain of, oppose, or object to Defendants' exploitative practices than employees of American national origin.

98. As part of their regular business practices, Defendants have intentionally, willfully, repeatedly,

and in bad faith harmed Plaintiff and the Title VII Collective by engaging in a pattern, practice, and/or policy of violating Title VII. This policy and pattern or practice includes, *inter alia*, the following:

    a. Seeking out and selecting non-American employees for employment who, by reason of their status as non-Americans, would be more likely to tolerate and less likely to complain of, oppose, or object to Defendants' exploitative employment practices, including Defendant's unlawful pay practices;

    b. Subjecting non-American employees to unsafe and dangerous working conditions, while not subjecting employees of American national origin to the same unsafe and dangerous working conditions; and

    c. Verbally abusing and hypercriticizing non-American employees, while not subjecting employees of American national origin to the same verbal abuse and hypercriticism.

99. Defendants have engaged in this unlawful conduct pursuant to a policy of exploitation of non-American employees by knowingly violating Title VII and the NYSHRL.

100. Defendants' unlawful conduct has been intentional, willful, and in bad faith, and has caused damage to Plaintiff and the Title VII Collective.

101. The FLSA Collective would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. Those similarly situated employees are known to Defendants, are readily identifiable by Defendants, and are locatable through Defendants' records, which Defendants are required to maintain. These similarly situated employees should be notified of and allowed to opt into this action.

**RULE 23 NYSHRL CLASS ALLEGATIONS – NEW YORK**

102. Plaintiff brings claims for relief as a class action, pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on behalf of a class consisting of herself and all current and former employees of non-American national origin, whom Defendants at any time within the three years prior to the filing of this action through the entry of judgment in this action (the "Rule 23 NYSHRL Class").

103.    The persons in the Rule 23 NYSHRL Class are so numerous that joinder of all members is impracticable.  The exact number of the Rule 23 NYSHRL Class is unknown to Plaintiff at this time, but there are believed to be 60 such persons.

104.    The identities of the Rule 23 NYSHRL Class members are known to the Defendants and are contained in the employment records that the Defendants are required to create and maintain.

105.    Common questions of law and fact exist as to all members of the Rule 23 NYSHRL Class that predominate over any questions affecting solely individual members.  Among the questions of law and fact common to the Rule 23 NYSHRL Class are:

      a.    Whether Defendants selected Rule 23 NYSHRL Class members for employment and subjection to Defendants' unlawful and exploitative employment practices because of their national origin;

      b.    Whether Defendants subjected Rule 23 NYSHRL Class members to unsafe and dangerous working conditions, while not subjecting employees of American national origin to the same unsafe and dangerous working conditions; and

      c.    Whether Defendants subjected Rule 23 NYSHRL Class members to verbal abuse and hypercriticism, while not subjecting employees of American national origin to the same verbal abuse and hypercriticism.

106.    The claims of Plaintiff are typical of the claims of the Rule 23 NYSHRL Class she seeks to represent.  Plaintiff and the Rule 23 NYSHRL Class work or have worked for Defendants within the three prior to the filing of this action. They enjoy the same statutory rights under the NYSHRL

to be free from discrimination and a hostile work environment on the basis of their national origin as Plaintiff.  Plaintiff and the Rule 23 Class have sustained similar types of damages as a result of Defendants' failure to comply with the NYSHRL.

107.    Plaintiff and the Rule 23 NYSHRL Class have all been injured in that they have been discriminated against and subjected to a hostile work environment on the basis of their national origin due to Defendants' common policies, practices, and patterns of conduct.

108.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Rule 23 NYSHRL Class.

109.    Plaintiff has retained counsel competent and experienced in employment discrimination and class action litigation.

110.    There are no conflicts between Plaintiff and the Rule 23 NYSHRL Class members.

111.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The members of the Rule 23 NYSHRL Class have been damaged and are entitled to recovery as a result of Defendants' common policies, practices and procedures.  Individual plaintiffs lack the financial resources necessary to conduct a thorough examination of Defendants' discriminatory practices and to prosecute vigorously a lawsuit against Defendants to recover damages for such unlawful conduct.  In addition, class action litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

112.    This action is properly maintainable as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

**FLSA COLLECTIVE ALLEGATIONS**

113.    Plaintiff brings claims for relief as a collective action pursuant to the FLSA, 29 U.S.C §

216(b), on behalf of all non-exempt employees of Defendants, including Assistant Teachers and Teachers, employed by Defendants at any time from three years prior to the filing of this action through the entry of judgment in this action.

114.   The FLSA Collective consists of approximately seventy-five (75) similarly situated current and former non-exempt employees of Defendants, who have been victims of Defendants' common policy and practices that have violated their rights under the FLSA, *inter alia*, as a result of Defendants' denying them minimum wage, overtime pay, and other monies

115.   As part of their regular business practices, Defendants have intentionally, willfully, repeatedly, and in bad faith harmed Plaintiff and the FLSA Collective by engaging in a pattern, practice, and/or policy of violating the FLSA. This policy and pattern or practice includes, inter alia, the following.

    a.   Failing to pay Plaintiff and the FLSA Collective minimum wages for all hours worked;

    b.   Failing to pay Plaintiff and the FLSA Collective the proper overtime pay for all hours worked over forty hours per week;

    c.   Failing to promptly pay Plaintiff and the FLSA Collective their full wages on the day their wages became due; and

    d.   Failing to maintain an accurate record keeping of hours worked and wages paid to Plaintiff and the FLSA Collective.

116.   Defendants have engaged in this unlawful conduct pursuant to a policy of minimizing labor costs and denying employees compensation by knowingly violating the FLSA and NYLL.

117.   Defendants' unlawful conduct has been intentional, willful, and in bad faith and has caused damage to Plaintiff and the FLSA Collective.

118.    The FLSA Collective would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit.  Those similarly situated employees are known to Defendants, are readily identifiable by Defendants, and are locatable through Defendants' records, which Defendants are required to maintain pursuant to the FLSA and NYLL. These similarly situated employees should be notified of and allowed to opt into this action pursuant to 29 U.S.C. § 216(b).

## RULE 23 NYLL CLASS ALLEGATIONS – NEW YORK

119.    Plaintiff brings claims for relief as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of themselves and all current and former non-exempt employees of Defendants, including but not limited to Assistant Teachers and Teachers, at any time six years prior to the filing of this action through the entry of judgment in this action (the "Rule 23 NYLL Class").

120.    The persons in the Rule 23 NYLL Class are so numerous that joinder of all members is impracticable.  The exact number of the Rule 23 NYLL Class is unknown to Plaintiff at this time, but there are believed to be over 100 such persons.

121.    The identities of the Rule 23 NYLL Class members are known to the Defendants and are contained in the employment records that the Defendants are required to create and maintain pursuant to the FLSA and NYLL.

122.    Common questions of law and fact exist as to all members of the Rule 23 NYLL Class that predominate over any questions affecting solely individual members.  Among the questions of law and fact common to the Rule 23 NYLL Class are:

        a.   Whether Defendants failed to pay the Rule 23 NYLL Class minimum wage for each hour worked;

b.  Whether Defendants failed to pay the Rule 23 NYLL Class overtime compensation at a rate of one-and-one-half times their regular hourly rate/applicable minimum wage rate for all hours worked over 40 in a workweek;

c.  Whether Defendants failed to pay the Rule 23 NYLL Class spread-of-hours pay for each workday that a shift or shifts exceeded 10 hours per day;

d.  Whether Defendants failed to promptly pay Plaintiff and the Rule 23 NYLL Class their full wages on the day their wages became due;

e.  Whether Defendants failed to furnish the Rule 23 NYLL Class with wage notices, as required by the NYLL and supporting regulations;

f.  Whether Defendants failed to furnish the Rule 23 NYLL Class with complete and accurate wage statements with each payment of wages including, *inter alia*, hours worked, rate of pay, overtime rate, and other statutorily required information pursuant to the NYLL and supporting regulations;

g.  Whether Defendants failed to keep true and accurate employment records including, *inter alia*, all records reflecting all hours/shifts worked by and wage payments made to the Rule 23 NYLL Class, as required by the NYLL.

123.  The claims of Plaintiff are typical of the claims of the Rule 23 NYLL Class she seeks to represent.  Plaintiff and the Rule 23 Class work or have worked for Defendants within the six years prior to the filing of this action. They enjoy the same statutory rights under the NYLL to be paid the correct minimum wage, to be paid overtime wages for all hours worked in excess of 40 in a workweek, to be paid spread-of-hours pay for workdays that their shift or shifts exceeded 10 hours per day, to be paid the full amount of their wages on the day the wages become due, to be given wage notices at the time of hire, and to be issued complete and accurate wage statements

along with each payment of wages.  Plaintiff and the Rule 23 NYLL Class have sustained similar types of damages as a result of Defendants' failure to comply with the NYLL.

124.    Plaintiff and the Rule 23 NYLL Class have all been injured in that they have been under-compensated due to Defendants' common policies, practices, and patterns of conduct.

125.    42.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Rule 23 NYLL Class.

126.    Plaintiff has retained counsel competent and experienced in wage and hour litigation and class action litigation.

127.    There are no conflicts between Plaintiff and the Rule 23 NYLL Class members.

128.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The members of the Rule 23 NYLL Class have been damaged and are entitled to recovery as a result of Defendants' common policies, practices and procedures.  Although the relative damages suffered by the individual class members are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation.  Individual plaintiffs lack the financial resources necessary to conduct a thorough examination of Defendants' compensation practices and to prosecute vigorously a lawsuit against Defendants to recover such damages.  In addition, class action litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

129.    This action is properly maintainable as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

## PLAINTIFF'S FACTUAL ALLEGATIONS

130.    In or around July 2019, Beda was residing in the United States on a J-1 visa, working as an au pair.

131.    In or around July 2019, Banahan and Billone interviewed Beda for a position with Defendants.

132.    During the interview, Beda informed Banahan and Billone that she was on a J-1 visa, which prevented Beda from lawfully working in the United States any capacity other than as an au pair.

133.    On or around July 25, 2019, Banahan and Billone offered Beda a position as a part-time Assistant Teacher with Nurtury, to begin at the commencement of the subsequent school year in September.

134.    Upon receiving the offer, Beda expressed concern about her ability to work for Defendants, given her immigration status.

135.    However, Banahan and Billone assured Beda that her immigration status was not an issue, as they employed many other foreign nationals legally residing in the United States on other visas.

136.    Banahan and Billone further told Beda that her duties working for the Nurtury Defendants would not interfere with her au pair responsibilities, which were necessary for Beda to continue to maintain her J-1 visa.

137.    Banahan and Billone further informed Beda they would pay her in cash.

138.    On or about September 4, 2019, Beda commenced employment with Defendants as a part-time Assistant Teacher.

139.    For the duration of her employment with Defendants, Beda was a non-exempt employee.

140.    As an Assistant Teacher for Defendants, Beda's duties and responsibilities included, but were not limited to: watching the children, keeping them safe, assisting when parents dropped off the children, feeding the children, changing their diapers, putting them to sleep, organizing the toys, and cleaning and sanitizing the room, for the schools to which she was assigned.

141.    For the duration of her employment with Defendants as a part-time Assistant Teacher, Beda did not receive any Montessori training.

142.    Despite Defendants giving Beda the title of "Assistant Teacher", she was not involved in any instruction of the students or the planning or organizing of events for the children, and none of Beda's duties and responsibilities required specialized knowledge.

143.    During the period of her employment for Defendants when Beda held the title of Assistant Teacher, her exclusive role was to provide childcare for Defendants' clients at the school or schools to which she was assigned.

144.    Upon her hire, Banahan and Billone assigned Beda to the North Avenue School.

145.    From September 2019 until the end of December 2019, Beda worked approximately 30 hours per week.

146.    From September 2019 until the end of December 2019, for the work Beda performed for Defendants, Defendants paid Beda $450, twice per month, in cash.

147.    During this period, Defendants set Beda's regular payday as semimonthly, on the 15th and 30th of each month.

148.    During this period, Defendants paid Beda her wages in cash, which either Banahan or Billone handed to her in an envelope.

149.    However, during this period, Defendants did not always timely pay Beda her full wages owed.

150.    For the duration of her employment with Defendants, Beda was an excellent employee, satisfactorily performing her duties and responsibilities.

151.    On several occasions during her employment with Defendants, Beda's obligations to the au pair program—the program necessary for her to maintain her legal status in the United States—conflicted with her schedule for Defendants.

152.    When her au pair program obligations conflicted with her schedule with Defendants, Banahan and Billone forced Beda to report to work for Defendants, jeopardizing Beda's visa status.

153.    Whenever Banahan or Billone required Beda to report to work for Defendants over her conflicting au pair obligations, Beda reminded them that her ability to legally remain in the United States on her J-1 visa required her to continue working as an au pair.

154.    Beda further reminded Banahan and Billone that when Beda raised this concern during her initial interview, Banahan and Billone specifically assured Beda that they would not do anything to jeopardize her visa status.

155.    Banahan and Billone responded to Beda's reminders of their promise not to jeopardize her visa status by threatening to terminate Beda's employment if her au pair obligations continued to conflict with Defendants' demands.

156.    At the end of December 2019, as a result of Beda's exceptional performance for Defendants and because she was extremely well-liked by Defendants' clients, Banahan invited Beda to continue working for Defendants, on the condition she stop working as an au pair.

157.    Beda pointed out that if she accepted Banahan's offer, she could not remain in the United States on a J-1 visa and would be required to apply for (and receive) a different visa/work authorization, find and secure her own housing and transportation, and pay for expenses including housing, transportation, and food.

158.    In response to her concerns, Banahan and Billone promised to provide Beda with housing and free Montessori training—to begin in or around September 2020.

159.    Banahan and Billone advised Beda that the Montessori training they were going to provide would allow Beda to apply for an F-1 visa and work for Defendants during the application process.

160.    Relying on Banahan's and Billone's promises and assurances, Beda accepted full-time employment with Defendants.

161.    In or around January 2020, Beda commenced full-time employment with Defendants as an

Assistant Teacher.

162.    Upon commencing full-time employment with Defendants, Defendants did not pay Beda on a salary basis.  Rather, Defendants paid Beda a wage of $15.00 per hour for every hour she worked in the classroom.

163.    Beda's classroom time—and thus, her pay—varied from week to week.

164.    For the duration of her employment with Defendants, Beda was not paid for any work performed outside the classroom.

165.    Upon commencing full-time employment with Defendants, Defendants provided Beda with an apartment above the Larchmont School, for which Beda was responsible for paying monthly rent to Defendants.

166.    However, from January 2020 until March 2020, despite living directly above the Larchmont School, Defendants assigned Beda to work at the Flandreau School.

167.    As a result of Defendants assignment of Beda to the Flandreau School, Beda was required to purchase a car to commute from her residence at the Larchmont School to the Flandreau School.

168.    Beda incurred expenses in connection with her required commute from the Larchmont School to the Flandreau School for work, including, but not limited to gasoline, for which she was not reimbursed by Defendants.

169.    As a full-time employee, Beda's immediate supervisor was Camelia Bruckel ("Bruckel").

170.    However, Banahan and Billone continued to exercise direct control over the terms and conditions of Beda's employment with Defendants.

171.    For the duration of her employment with Defendants, Beda was not paid properly, was subjected to humiliating and offensive discrimination and a hostile work environment based upon her national origin and sex/gender, including sexual harassment, and after complaining of

Defendants' unlawful conduct, was further subjected to retaliation.

172.    In or around March 2020, due to the COVID-19 pandemic, Defendants shut down all the Nurtury schools under their ownership/operational control.

173.    However, Defendants' shutdown was short-lived, lasting only two weeks.

174.    Two weeks after shutting down, Banahan and Billone reopened the Larchmont School.

175.    Defendants' reopening of the Larchmont school was in blatant violation of Executive Order 202.4, issued by Governor Andrew Cuomo, and CDC guidance and exposed the children in their care (and the public) to extreme risk of exposure to an unknown and potentially fatal virus.[1]

176.    Because Defendants' schools are located in residential houses, Defendants were able to surreptitiously reopen their facilities.

177.    In addition to exposing the general public—including dozens of children—to risk of Coronavirus infection, Defendants discriminated against Beda based upon her national origin by forcing only her and Nicole Garcia ("Garcia"), a Teacher of Brazilian national origin, to work in-person, in the classroom with students, subjecting her to a substantial risk of infection.

178.    Upon the reopening of the Larchmont school, Defendants discriminatorily required Beda and Garcia to be physically present at the school.  Beda and Garcia were the only two employees required to engage with the children in person.  Of all Defendants' employees, only Beda, Garcia, Camila Cesar ("Cesar"), Mercedes Teixeira ("Teixeira"), and Leticia (last name currently unknown) ("Leticia")—all Brazilian women—were not permitted to work remotely.

179.    At the height of the Coronavirus pandemic in Westchester, despite knowingly and unlawfully exposing Beda, Garcia, and the children (thereby exposing their families and the public at large) to an extreme risk of contracting Coronavirus, Defendants did not provide Beda, Garcia, or the

---

[1] The Coronavirus outbreak in Westchester was so severe and pervasive that on March 10, 2020, Governor Cuomo called New Rochelle "the most significant cluster in the country."

children with masks, sanitizer, or other protective equipment to reduce the risk of Covid transmission.

180.    Shortly after Beda began working in-person at the Larchmont School, she learned Defendants other teachers and assistant teachers were given the option to work remotely.

181.    Beda called Banahan and requested to also work remotely.

182.    During this call, Beda complained to Banahan that she was never given the opportunity to work remotely and told Banahan had she known of the option to work remotely, she would have done so.  Beda reminded Banahan that she lived alone and did not have any friends or family that could take care of her if she contracted Coronavirus.

183.    As Defendants knew, and as Beda reminded Banahan, Beda did not have employer sponsored health insurance, was not eligible for government provided health insurance, and could not afford to purchase health insurance individually.

184.    Despite the opportunity afforded by Defendants to employees of American national origin to work remotely and despite Beda's requests, Banahan refused to allow Beda to work remotely.

185.    Defendants discriminated against Beda on the basis of her non-American national origin by refusing to allow her to work remotely and requiring her—in violation of New York State law— to continue working in-person through the pandemic.

186.    After Beda continued to complain of discriminatory and unlawful working conditions, Banahan reluctantly agreed to increase Beda's wage rate to $20.00 per hour and further promised me her that she would not be responsible for paying rent until 'everything goes back to normal'.

187.    For approximately two months—in or around March and April 2020—Defendants increased Beda's wage rate to $20.00 per hour and did not require her to pay the $600 monthly rent Defendants charged her for residing in the Larchmont School.

188.    Despite Beda's misgivings, she was left with no choice but to continue working for Defendants as she was unable to receive unemployment benefits, needed Defendants to provide her with the Montessori training that served as the basis of her F-1 visa allowing her to legally remain in the United States, and she could not return to Brazil due to Coronavirus-related travel limitations.

189.    Although Banahan promised to raise Beda's wages to $20.00 per hour, in or around May 2020, Defendants reduced Beda's pay rate to $15.00 per hour for every hour of work Beda performed in the classroom.

190.    Additionally, in or around May 2020, Defendants required Beda to resume paying $600 monthly rent for her residence at the Larchmont School.

191.    Beda complained to Banahan about the reduction in her wages and the resumption of her rent payments, reminding Banahan that she had promised to pay Beda until 'everything [went] back to normal'.

192.    Banahan responded by dismissing Beda's complaints, and she refused to reinstate Beda's $20.00 per hour pay rate or rent freeze.

193.    Shortly after reopening the Larchmont School, Banahan and Billone sent Beda a proposed employment contract for her signature.

194.    The terms of the proposed contract did not reflect the promises made to Beda by Banahan and Billone at the end of December 2020 or the subsequent promises made to Beda by Banahan after Beda complained that Defendants' required her to provide in-person caregiving services to the children at the unlawfully reopened school.

195.    Specifically, the proposed contract would have required Beda to pay $600 per month as rent for her apartment above the Larchmont School and $10,000 total for her Montessori training,

which was to be paid in monthly installments over the course of three (3) years, upon the commencement of her training. In the event the employee left Defendants' employ prior to completing the Montessori training, the employee was obligated to pay to Defendants the balance of $10,000 less what the employee had paid towards the $10,000 amount.

196.     Upon information and belief, at all times relevant to this action, a contract including the Montessori training payment requirement was offered to all of Defendants' Assistant Teachers and Teachers.

197.     Upon information and belief, at all times relevant to this action, a contract including the rent payment requirement was offered to all of Defendants' Assistant Teachers and Teachers who resided in properties owned or controlled by Defendants.

198.     At all times relevant to this action, Defendants never notified Beda of their intention to take a credit against any portion of Beda's wages for a reduced rent rate.

199.     At all times relevant to this action, to legally remain in the United States and employed by Defendants, all Assistant Teachers and Teachers who were not citizens or otherwise legally authorized to work in the United States were required to ultimately enroll in and complete the Montessori training program.

200.     At all times relevant to this action, Defendants required all Assistant Teachers and Teachers enrolled in the Montessori program to pay the tuition for the Montessori training program.

201.     However, at all times relevant to this action, Defendants permitted employees—including Beda—to work as Assistant Teachers and Teachers prior to commencing the Montessori training program.

202.     At all times relevant to this action, Beda was not enrolled in the Montessori training program until in or around October 2020.

203.    At all times relevant to this action, employees of Defendants, including Beda, were not required to commence or complete any licensing, post-secondary education, or specialized qualification or training—including the Montessori training—to perform the duties and responsibilities of an Assistant Teacher.

204.    At all times relevant to this action, employees of Defendants, including Beda, were not required to possess any experience in the field of education to perform the duties and responsibilities of an Assistant Teacher.

205.    On or around April 1, 2022, when Defendants' reopened the Larchmont School, the school was open to children from 9:00 a.m. to 5:00 p.m., from Monday through Friday.

206.    However, Beda was required to perform work before and after the children arrived.

207.    As a result, Beda worked approximately 48-52 hours per week, for which she was not paid overtime.

208.    Initially upon the reopening of the Larchmont School, Garcia and Beda were responsible for five children.  Shortly thereafter, the number of children for whom Garcia and Beda were responsible for caring for in-person expanded to eight.

209.    Inevitably, given the severity of the pandemic and the lack of precautions taken by Defendants to protect staff and the children, Garcia was exposed to Coronavirus and was required to quarantine.

210.    Defendants never notified employees, the children, or their families of Garcia's exposure.

211.    Beda only learned of Garcia's exposure—and, because she was working in close contact with Garcia, her own exposure—when Banahan told Beda that Alejandra (last name currently unknown) ("Alejandra") was going to be filling in for Garcia.

212.    Because she was afraid Defendants would terminate her employment, Beda did not request to

quarantine, despite her exposure to Coronavirus.

213.    While Garcia was quarantining, Alejandra, a Teacher of Mexican national origin, assumed

Garcia's responsibilities.

214.    Alejandra and Beda worked together at the Larchmont School until on or around April 25,

2020.

215.    In or around the last week of April 2020, Banahan and Billone reopened the schools they

owned/operated that had been closed, resuming in-person instruction.

216.    Defendants' resumption of in-person instruction at or around the end of April 2020 was in

further express violation of Governor Cuomo's Executive Orders.

217.    Banahan and Billone gave Defendants' clients the opportunity to attend the schools in-person

or remotely.

218.    Upon their reopening of the schools under their ownership/control, Banahan and Billone

assigned Beda to work at the Flandreau school, where she was required to continue providing in-

person caregiving to the children.

219.    At Flandreau, Beda worked with Andrea (last name currently unknown) ("Andrea"), a

Teacher of Mexican national origin.

220.    For the duration of her employment with Defendants, other than one business (not payroll)

check, Defendants paid Beda's wages in cash.

221.    At Banahan's direction, Beda sent Banahan a text message of the hours she performed work

in the classroom worked for the preceding two weeks.

222.    Defendants established that Beda was to be paid twice per month—on the 15th and 30th of

every month.

223.    After she began working for Defendants full-time, Banahan handed Beda an envelope with

cash, purporting to represent Beda's pay for the amount of hours Beda worked since the previous pay period.

224. However, in or around the end of May 2020, Beda first noticed the cash she was receiving in the envelope handed to her by Banahan was short and did not reflect all the classroom hours she worked for Defendants.

225. On a regular basis, Defendants failed to pay Beda for all the hours she worked—including classroom and non-classroom hours—often shorting her by more than $100 per pay period.

226. Defendants never paid Beda the overtime premium for the hours she worked over 40 per week.

227. In addition to unlawfully underpaying Beda, Defendants routinely failed to timely pay Beda.

228. On a regular basis throughout her employment with Defendants, Defendants delayed Beda's pay by as long as a week beyond her regular pay date.

229. On multiple occasions, Beda needed to remind Banahan to pay her for her previously worked hours.

230. Despite Beda's complaints of Defendants' regular failure to pay her timely, for the duration of her employment with Defendants, Defendants continued to fail to timely pay Beda's wages.

231. In or around May 2020, Banahan instructed Beda and Teixeira to each provide her with a Social Security Number of a person they trusted.

232. Banahan explained to Beda and Teixeira that she needed a Social Security Number of a person they trusted to pay their wages through the third party's identity.

233. Banahan told Beda she would not be paid until she found someone who was willing to provide his or her Social Security Number.

234. Beda was extremely upset and uncomfortable Defendants' requirement she participate in

fraudulent conduct to receive her pay, having been assured by Banahan and Billone before she accepted the full-time position with Defendants that she would not be required to do anything unethical, illegal, or in potential violation of her visa to work for Defendants.  Beda relied on those assurances made by Banahan and Billone in accepting the offer of full-time employment with Defendants.

235.    Ultimately, Banahan told Beda she would use her own Social Security Number through which she would pay Beda's wages.

236.    Banahan further told Beda she would be withholding $510 per month from Beda's pay for taxes.

237.    Banahan assured Beda that the pay arrangement was only temporary and would only last for two months.

238.    Beda did not understand why Banahan was withholding $510 monthly, and she asked Banahan how Banahan knew the proper amount of taxes to withhold from Beda's paycheck.

239.    Banahan replied by telling Beda not to worry about it, and Banahan refused to provide any documentation indicating the proper amount of taxes to be withheld from Beda's pay.

240.    During the next pay period, Defendants withheld $510 from both Beda's and Teixeira's pay envelopes.

241.    Both Beda and Teixeira expressed doubts regarding the accuracy of the taxes withheld and individually complained to both Banahan and Billone, confronting them about the improper withholdings.

242.    After Beda and Teixeira complained about Defendants' improper withholdings and their failure to provide any basis or support for the amount of taxes withheld from their pay, Billone agreed not to withhold taxes from Beda's and Teixeira's pay the next month.

243.    For the duration of Beda's employment with Defendants, Defendants never provided Beda

with a statement reflecting the breakdown of taxes withheld from Beda's pay.

244.    In or around May 2020, Banahan complained to Beda that it was too inconvenient to continue

to pay her cash because, in order to pay Beda, Banahan needed to withdraw money from multiple

ATMs.

245.    Banahan told Beda to register for a payment app—either Venmo or Zelle—for Banahan's

convenience.

246.    As using Venmo or Zelle would have required Beda to create and input false bank account

information, Defendants again placed Beda in a situation that would, if discovered, jeopardize her

immigration status.

247.    Beda told Banahan she was not comfortable using a payment app.

248.    In response, Defendants delayed Beda's pay by two weeks, retaliating against Beda for her

opposition to Defendants' unlawful pay practices.

249.    Shortly after Defendants' retaliatory delay of her pay, Beda, no longer able to tolerate

Defendants' unlawful and unethical conduct and the repeated disregard for the promises initially

made to her inducing her to accept employment, advised Banahan she could not continue working

for Defendants.

250.    However, on or around May 30, 2020, only days after Beda indicated her intent to accept her

constructive termination, Banahan called Beda and pleaded for her to return.

251.    Banahan told Beda that Andrea was involved in a car accident and was unable to work that

Monday—June 1, 2020.

252.    To support Andrea and the children, Beda agreed to cover for Andrea on June 1, 2020.

253.    While covering for Andrea on June 1, 2020, Beda asked Banahan for an update regarding

Andrea's ability to work.

254.    Banahan responded that she, Billone, and Bruckel were considering offering Beda the Teacher position, to replace Andrea, who had sustained extremely serious injuries in the car accident.

255.    Expecting an imminent offer for the Teacher position, Beda agreed to continue working for Defendants.

256.    Despite Banahan's implication that the decision to offer Beda the Teacher position would be made in days, Defendants took the entire month of June to deliberate.

257.    Throughout the month of June 2020, Beda continued to work as an Assistant Teacher, earning $15.00 per hour for the work she performed in the classroom.

258.    Ultimately, in or around the beginning of July 2020, Defendants promoted Beda to Teacher.

259.    Despite her promotion, Beda was required to spend significantly more than half of her workday performing tasks not related to the instruction, or preparation of instruction, of Defendants' students.

260.    From the beginning of May through the end of July 2020, Beda performed in-classroom work from Monday through Friday, from approximately 7:30 a.m. to between 5:30 p.m. and 6:30 p.m.—approximately 50-55 hours per week of in classroom work—without receiving overtime or spread-of-hours pay.

261.    During this period, Beda was not paid a fixed salary, but rather paid a wage of $15.00 per hour for each hour she worked as an Assistant Teacher and a wage of $18.00 per hour beginning in or around the beginning of July 2020, when she was promoted to Teacher, with her wages varying with each pay period based upon the amount of hours she worked during that pay period.

262.    During this period, Beda performed, approximately, an additional five (5) additional hours of work per week outside of the classroom, for which Defendants did not pay her at all.

263.    Until in or around the end of September 2020, Beda performed all of the duties and responsibilities of a Teacher without any training in the Montessori Program.

264.    Prior to Beda's employment with Defendants, Beda had no experience as a teacher or training in the Montessori Program, and Beda's only prior experience relevant to her duties and responsibilities as an Assistant Teacher or Teacher was her previous employment providing care for children as an au pair.

265.    Despite Beda's lack of experience, qualifications, or training, she was able to successfully perform her duties and responsibilities as a Teacher because such training—although ultimately required by Defendants—was not necessary based upon Banahan's and Billone's operation of the Nurtury Defendants.

266.    As a Teacher, Defendants continued not to pay Beda on a salary basis.  Rather, Defendants paid Beda $18.00 per hour for each hour of in-classroom work she performed.

267.    As a Teacher, Beda's classroom time—and thus, her pay, continued to vary from week to week.

268.    From in or around the end of July and continuing until her constructive termination from Defendants, Beda continued to be paid for approximately 48-52 hours per week of in-classroom work performed.

269.    Defendants tracked Beda's in-classroom hours by use of a phone application.

270.    Defendants instructed Beda to clock in when she entered the classroom, and clock out when she left the classroom.

271.    Defendants did not permit Beda to clock in or out for any work Beda performed outside of the classroom.

272.    From in or around the end of July 2020 until her constructive termination from Defendants,

Beda performed approximately an additional 10-12 hours of work per week for Defendants outside of the classroom, usually during the weekends, for which she was not paid at all.

273.   Defendants continued to pay Beda a flat rate hourly rate, in cash, regardless of how many hours she worked, for only the in-classroom hours she worked.

274.   Further, for the duration of her employment with Defendants, Defendants never provided Beda with a 30-minute lunch break.

275.   Rather, Banahan and Billone complained about Beda and other Teachers taking time to use the bathroom.

276.   Additionally, Defendants continued to increase the number of children for whom Beda was responsible, ultimately forcing her to care for as many as seventeen (17) children at once—well beyond the number of children form whom Beda could properly care and more children than many other American employees were required to care for.

277.   Banahan and Billone directed Beda not to tell parents of Defendants' students how many children were in the classroom, despite repeated inquiries from the parents.

278.   In addition to her wages, when Beda's Montessori training began in or around October 2020, Defendants paid for her Montessori training.

279.   However, if, for any reason Beda's employment with Defendants ended before she completed the Montessori training, she would be required to pay Defendants the amount Defendants had paid Montessori for her incomplete training—$6,666, if she was no longer employed with Defendants after one year, and $3,333 if Beda was no longer employed with Defendants after two years.

280.   Defendants, knowing Beda was unable to afford thousands of dollars of "early termination" fees and that her ability to remain legally in the country depended on her continuing Montessori

training, discriminatorily took advantage of Beda's vulnerability and inability to leave by continuing to improperly pay her.

281.　It was Defendants' common practice to discriminate against the employees of non-American national origins—including Beda, Teixeira, Garcia, Cesar, Leticia, and others—by refusing to pay them minimum wage and overtime, forcing them to work hours for which they did not get paid at all, subjecting them to longer workdays with more responsibilities in worse working conditions, and subjecting them to verbal abuse and hypercriticism.

282.　Defendants exploited their non-American employees, including Beda, because Banahan and Billone knew that contrary to Defendants' American employees, the non-American employees had essentially no recourse to complain, and termination from Defendants would result in the loss of the non-American employees' legal right to remain in the United States.

283.　As with Beda, it was Defendants' practice to hire non-American teachers reliant on an F-1 visa, accessible to Defendants' employees through Defendants' affiliation with Montessori and access to the Montessori training program, specifically because the threat of termination from Defendants—and thus, separation from the Montessori training program—forced non-American employees to accept abusive, discriminatory, and unsafe working conditions without lawful minimum compensation.

284.　In or around the middle of July 2020, Beda and Leah (last name currently unknown) ("Leah"), an Assistant Teacher at Nurtury, complained to Billone that they were not being paid properly.

285.　Billone responded that Beda and Leah were not entitled to overtime pay, and she would discuss their complaints with them the next day.

286.　However, Billone never discussed Beda's or Leah's complaints with them, and Defendants continued their unlawful pay practices.

287.   Subsequent to Beda's complaints, Defendants failed to remediate their unlawful pay practices and continued to pay Beda the flat hourly rate of $18.00 per hour, regardless of how many hours she worked, only for in-classroom work performed by Beda.

288.   Shortly after the new school year began in or around September 2020, Defendants' verbal abuse and hypercriticism of Beda escalated.

289.   In further discrimination against Beda and in retaliation for her complaints of underpayment, Bruckel constantly yelled at Beda in front of children and other staff, loudly, persistently, and publicly criticized her performance in front of her students and staff (even when she was following the instruction she started receiving from Montessori training), and undermining Beda by complaining to her Assistant Teachers about her performance when Beda was not present.

290.   Bruckel directed the abusive discriminatory and retaliatory conduct towards Beda and not to other American employees and employees who did not complain about their unlawful pay.

291.   In or around October 2020, Defendants required Teachers to evaluate themselves and the Assistant Teachers assigned to them.

292.   Beda spoke with the two Assistant Teachers who were assigned to her: Leah and Ryan (last name currently unknown) ("Ryan").   Leah and Ryan expressed that they were feeling very overwhelmed and had been getting sick because Defendants were overworking them, but Defendants was refusing to provide them with sick time to recover.

293.   Additionally, Leah complained to Beda that Defendants were requiring her to work 11-hour days but not paying her for more than her scheduled hours.

294.   As part of the evaluation process, Beda relayed the complaints of Leah and Ryan to Bruckel.

295.   Neither Bruckel nor any of Defendants' management remediated the working conditions Beda complained of on behalf of her Assistant Teachers, including Leah's complaints of Defendants

failing to pay her for all hours worked.

296.    During October 2020, Beda was tasked with drafting conference reports, to be presented to the parents of Defendants' students in the beginning of November 2020.

297.    As this was Beda's first time drafting conference reports, Beda asked Bruckel for assistance.

298.    Bruckel told Beda there was a template in the binder given to all Teachers; however, Defendants never gave Beda a binder.  Upon information and belief, Beda was the only Teacher not given a binder.

299.    Beda told Bruckel she never received a binder, but Bruckel refused to provide her with any further assistance.

300.    After Bruckel refused to provide me further assistance, Beda was forced to resort to asking other Teachers for guidance in completing the conference reports.

301.    When Bruckel reviewed Beda's conference reports, Bruckel upbraided Beda for doing the reports "incorrectly" and insisted Beda redo the conference reports.

302.    As a result, Beda was forced to redo fourteen (14) reports in an extremely limited time frame, requiring her to work after hours and during the weekend.  Defendants did not pay Beda for any of the time she spent preparing the corrected reports.

303.    During the weekend she was correcting the conference reports, Beda became ill with a fever and sore throat.

304.    Beda spoke with Leah, who had also developed similar symptoms, raising concerns that both Leah and Beda contracted the Coronavirus.

305.    Beda texted Bruckel, explaining that she did not feel well and would take a COVID test prior to coming in the following Monday.

306.    Bruckel dismissed Beda's concerns, replying that Beda's illness was due to '100% stress' and

that she should 'rest, drink water, gargle some warm water and salt, and go to work on Monday', because the parent-teacher conferences were beginning on Monday.

307.    Bruckel's requirement that Beda come to work in-person days after experiencing symptoms consistent with Coronavirus infection was particularly pernicious, as Defendants permitted other Teachers' parent-teacher conferences to be held by Zoom, from any location.

308.    Bruckel further told Beda to wear a scarf around her neck (to hide her illness) and said she would pray for Beda.

309.    Upon information and belief, Bruckel is not a doctor.

310.    Beda was extremely disconcerted by Bruckel's response, afraid that she had contracted Coronavirus and concerned that she could potentially spread the virus to other employees and the children in her care, as well as the students' parents at the parent-teacher conferences.

311.    Beda told Banahan that Bruckel instructed her to appear in-person for the parent-teacher conferences, despite her symptoms consistent with a potential Coronavirus infection.  Beda asked Banahan to confirm Defendants' position was to force her to appear in-person for the parent-teacher conferences, despite her illness and potential contagiousness.

312.    Banahan responded by giving Beda conflicting directions, telling Beda that it was her responsibility to stay home if she was sick, but also that she needed to follow Bruckel's instructions.

313.    Beda was confused and frustrated, as Banahan's directions were contradictory, clearly intended to absolve Banahan of any responsibility.

314.    For the following two days, Beda was extremely ill and unable to work.

315.    Because she did not work as a result of her illness and potential Coronavirus infection, Defendants' retaliatorily delayed Beda's pay.

316.    When Beda asked Banahan why Defendants were delaying her pay, Banahan responded that she did not pay Beda because Beda was not working during the days that she was scheduled to work.

317.    Beda—desperate for her wages—asked Banahan to Venmo her wages to her boyfriend.

318.    Beda further complained to Banahan that it was illegal for Banahan to withhold her pay.

319.    However, Banahan replied that she took Beda's complaints of Defendants' unlawful pay practices as a threat to the Defendants.

320.    Additionally, Banahan threatened Beda's employment, telling Beda she should take care of her health, because she could not take any further sick days after having missed two days to quarantine.

321.    After becoming ill, Beda quarantined at her boyfriend's apartment in Connecticut to avoid potentially exposing the students and other residents of the Larchmont School to infection, as Beda could not access a kitchen or other facilities at the Larchmont School while maintaining quarantine.  Defendants were aware that Beda was quarantining in Connecticut.

322.    While Beda was ill and quarantining due to her presumed Coronavirus infection, Banahan texted Beda, demanding Beda break quarantine to go to the Larchmont School—an approximately 90 minute drive from her boyfriend's apartment—to move her car.

323.    As the Larchmont School's driveway in which Beda's car was parked easily fits two cars, there was no pressing need to force Beda to break quarantine—while she was sick and symptomatic—to move her car.

324.    When Beda reminded Banahan she was still sick and was quarantining, Banahan ignored Beda's concerns and continued to demand Beda immediately move my car from the Larchmont School's driveway.

325.    During Beda's quarantine, Bruckel texted Beda incessantly, inquiring when she was going to return to work.

326.    On Friday, November 13, 2020, Beda received a negative COVID-19 test and immediately told Banahan, Billone, and Bruckel the test results, explaining that she would return to work the following Monday.

327.    Extremely distressed and no longer able to tolerate the discriminatory, hostile, and retaliatory work environment, the unlawful pay practices, and the stress Defendants placed on Beda during her quarantine, Beda requested a meeting with Banahan and Billone to discuss the discriminatory, hostile, and retaliatory work environment, with the intention of accepting her constructive termination.

328.    In Beda's initial request for a meeting, she did not mention her intention to accept her constructive termination but expressed her distress and frustration.  Banahan, continuing her pattern of dismissing Beda's concerns, would only schedule a phone call.

329.    When Beda spoke with Banahan, Beda advised Banahan that she could not continue to work for Defendants, and only then did Banahan schedule a meeting to discuss Beda's concerns.

330.    Beda met with Banahan and Billone at the Rye Brook Nurtury Montessori school owned and operated by Beda and Banahan.

331.    During the meeting, Beda recounted the discrimination, hostile work environment, retaliation, and unlawful pay practices to which she was subjected at and by Defendants.

332.    Beda further explained that despite her repeated complaints, the unlawful conduct continued, and she was no longer able to continue working for Defendants.

333.    Banahan and Billone repeatedly pressured Beda into staying at the school and continuing employment with Defendants.

334.    At one point during the conversation, Beda told Banahan and Billone that the stress and anxiety she experienced as a result of their unlawful conduct required her to take stress-relieving medication and sleep aids, to which Banahan callously replied, "that's life".

335.    After persistent pressure from Banahan and Billone, Beda agreed to continue working for Defendants for one more month—until December 18, 2020—after which Beda would leave if her complaints were not remediated.

336.    On or around Tuesday, November 24, 2020, Beda received news that a parent of one of the children she supervised tested positive for Coronavirus.

337.    The exposed child attended school all day on Monday and Tuesday and was in close contact with Beda.

338.    Immediately after being notified by the parent, Beda asked Bruckel for instructions on how to proceed.

339.    Bruckel and Banahan agreed that they did not want to notify the parents right away and waited until the end of the day to notify the parents.

340.    Banahan decided to switch from in-person instruction to a full remote schedule, beginning on Wednesday, November 25, 2020, and continuing until the parents and child of the family who tested positive subsequently tested negative.

341.    Working remotely, Beda was required to work even longer hours for Defendants, performing work from 7:30 a.m. until 7:00 p.m. the first day Defendants switched to a fully remote schedule.

342.    That Friday, November 27, 2020, Banahan told Beda that she needed to work through the weekend.

343.    Beda asked Banahan if she would be paid for working during the weekend, to which Banahan responded that Beda would not be paid for working over the weekend.

344.    Banahan further told Beda it was Beda's obligation to work without pay because, "[at] the nurtury, children and parents come first."

345.    Unwilling to continue to work for Defendants without pay, Beda advised Banahan she would start the work on Monday.

346.    Banahan replied that it was 'normal' to work the weekends without pay, that all of the other Teachers worked during the weekend, and, therefore, Beda must work the weekend.

347.    Realizing Defendants' unlawful pay practices and discriminatory environment were never going to change, Beda accepted her constructive termination, notifying Banahan she could not continue working for Defendants.

348.    To allow Defendants time to hire another teacher, for the benefit of the children under her care, Beda advised Banahan her last day working for Defendants would be December 18, 2020.

349.    In response to Beda's notification that she would no longer work for Defendants, Banahan told Beda she was obligated to pay Defendants $8,000, purportedly representing the balance of her Montessori training, before my last day working for Defendants.

350.    Beda replied to Banahan that she could not afford to pay $8,000 within two weeks and asked to continue the training and pay off the balance of the $8,000 as she received the training, because Beda needed to remain enrolled in the training program to remain in the United States legally.

351.    Banahan responded by threatening Beda with legal action.

352.    Banahan further told Beda that since she would no longer be under Defendants' sponsorship, she could not simply leave Defendants—she would have to first pay off her debt to Defendants for the Montessori training, and then be deported for not continuing her training, even though Beda previously indicated that she wished to continue her Montessori training.

353.    After Banahan's threat of legal action, Beda was terrified and was no longer able to continue

working for Defendants, even for the remaining few weeks.

354.   On or around November 29, 2020, Beda was forced to accept her discriminatory and retaliatory constructive termination from Defendants.

355.   As a result of being forced to accept her constructive termination from Defendants, Beda was required to move out of the apartment above the Larchmont School, where she had been resided for the duration of her full-time employment with Defendants.

356.   As Beda was moving out of Defendants' apartment, Banahan threatened Beda that Beda better be packed, because Banahan contacted her lawyer and the police to ensure that Beda would be deported.

357.   Beda was so terrified by Banahan's discriminatory and retaliatory threats that Beda preemptively informed the police that she may need them to accompany her to her apartment.

358.   The following week, Banahan emailed Beda, telling Beda that her lawyer would email Beda an agreement for Beda to pay back the tuition for the Montessori training.

359.   In addition, Banahan told Beda that she withheld all of the wages due to Beda from the last pay period Beda worked—which she undercalculated as $1,701—and put it towards the Montessori training, against Beda's wishes.

360.   Defendants unlawfully and retaliatorily withheld Beda's final paycheck.

361.   In addition to the aforementioned national origin-based discrimination, hostile work environment, retaliation, and wage violations, Defendants subjected Beda to discrimination and a hostile work environment on the basis of her sex/gender by subjecting her to sexual harassment.

362.   During her employment with Defendants, Beda was sexually harassed by Alex Bruckel ("Alex"), Bruckel's husband, who was employed by Defendants as a cook.

363.   While employed by Defendants, one of Beda's duties and responsibilities was to wash, dry,

and put away the dishes after the children finished lunch.

364.     Beginning in or around July 2020 and continuing through the end of Beda's employment with Defendants, whenever Beda went to grab the dish towel to wipe the plates dry and Alex was in the kitchen, Alex grabbed the dishtowel from its location and placed it down the front of his pants. Beda asked Alex to hand her over the dish towel, but each time, Alex would refuse and tell Beda she needed to grab it from his pants.  Left with no other choice, Beda was forced remove the dish towel from Alex's waist.

365.     Alex's sexual harassment of Beda was not limited to requiring her to remove the dish towel from his pants.

366.     On one occasion in or around September 2020, when Beda entered the kitchen, Alex complained to Beda about Teixeira, with whom he had been having a dispute.  In complaining about Teixeira to Beda, Alex called Teixeira "dirty," and said, "Of course. She is Brazilian, what should I expect?"

367.     Beda was outraged and offended by Alex's racist comments.

368.     Alex, seeing Beda was upset and remembering that Beda was also Brazilian, attempted to give Beda an unsolicited and unwanted kiss and hug and told Beda, "Not all of them [referring to Brazilians] are dirty."

369.     Beda only avoided Alex's lunging, unwanted kiss by pushing him away.

370.     Beda was stunned and disgusted by Alex's outrageous conduct, both in terms of the aggressive, unwanted sexual advance and his racist comments about Brazilians.

371.     During Beda's employment with Defendants, Defendants maintained video cameras in their schools to monitor areas open to the children during the day.

372.     During Beda's employment with Defendants, at the Larchmont School, Defendants

maintained video cameras at the front door, in the living room, and in the basement—where the laundry room was located.

373.    For the duration of Beda's full-time employment with Defendants, Beda lived in the same residential house where Defendants operated the Larchmont School.

374.    Rather than turn the cameras off after the students left, Defendants continued to leave the cameras on, live streaming and recording footage of Beda and other employees in their residences.

375.    Defendants never told Beda or the other employees that Defendants continued to leave the video cameras turned on even after the children left for the day—an extreme invasion of Beda's and the other employees' privacy.

376.    After Beda moved into the apartment in the same building as the Larchmont School, Beda was told by a coworker to be careful in her apartment, because after the children leave, Alex watches the women living at the apartments provided by Defendants to their employees through the cameras.

377.    Beda later confirmed her coworker's comments when, after she told Bruckel she heard noises in her apartment, Bruckel advised Beda that Alex would check the cameras.

378.    Defendants were on notice that Alex posed a substantial risk of sexual harassment to Beda prior to and during his continued sexual harassment of Beda.

379.    Beda was not the only victim of Alex's sexual harassment of Defendants' female employees.

380.    Among other women, in addition to Beda, Andrea, Leah, and Denise (last name currently unknown) were subjected to sexual harassment by Alex.

381.    Another of Defendants' employees, Denise (last name currently unknown) ("Denise") saw Alex spying on her while she was using the bathroom, looking through the window.

382.    Multiple employees—including Denise and Jessie (last name currently unknown), a Teacher

employed by Defendants, complained about Alex's sexual harassment to Banahan, but Banahan refused to take any action.

383.    Upon information and belief, Banahan and Defendants refused to take any action to remediate the employees' complaints of sexual harassment by Alex because Alex is Bruckel's husband.

384.    After and despite the complaints of sexual harassment lodged by multiple female teachers against Alex, Alex continued to sexually harass Beda.

385.    Defendants forced Plaintiff to accept her constructive termination in retaliation for her complaints of, and opposition to, Defendants' unlawful pay scheme and Defendants' discriminatory policies, practices and procedures.

386.    Beda's situation at her job was intolerable as a result of the discrimination and hostile work environment to which he was subjected by Defendants.

387.    Defendants' unwanted hostile actions created a hostile work environment which no reasonable person could be expected to tolerate.

388.    Throughout Beda's employment with Defendants, Beda complained to Defendants about this unlawful conduct.

389.    After and because Beda complained to Defendants, Beda became the subject of retaliation by Defendants.

390.    During Beda's employment with the Defendants, Beda was and continued to be regularly exposed to a discriminatory, offensive, and hostile work environment until her discriminatory and retaliatory constructive termination.

391.    Beda further objected to Defendants' unlawful failure to provide her with the paid quarantine sick leave to which he was entitled.

392.   After and as a result of Beda's complaints of Defendants' unlawful failure to provide her the paid sick leave to which she was entitled, Defendants refused to correct their unlawful employment practices, resulting in Beda being forced to retaliatorily accept her constructive termination.

393.   Defendants' actions and conduct were and are intentional and intended to harm Beda.

394.   Defendants have caused damage and injury to Beda by first subjecting her to a hostile work environment and discrimination and then again by protecting the individuals that caused and created the hostile work environment, while retaliating against her.

395.   Beda has been unlawfully discriminated against, was humiliated, and has been degraded and belittled; and as a result, she suffers loss of rights, emotional distress, loss of income, and earnings.

396.   As a result of Defendants' actions, Beda felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

397.   As a result of Defendants' discriminatory and intolerable treatment, Beda suffered severe emotional distress.

398.   As a result of the acts and conduct complained of herein, Beda has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Beda has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

399.   For the duration of her employment with Defendants, Defendants failed to pay Plaintiff the applicable minimum wage rate in accordance with the FLSA and NYLL.

400.   For the duration of her employment with Defendants, Plaintiff regularly worked more than 40

hours per week but was not paid overtime pay at one-and-one-half times the applicable rate by Defendants.

401.    For the duration of her employment with Defendants, Plaintiff regularly worked a shift or shifts more than 10 hours in a day in duration, but she was not paid spread-of-hours pay.

402.    Defendants failed to keep accurate records of wages earned or hours worked by Plaintiff.

403.    For the duration of her employment with Defendants, Defendants did not provide Plaintiff with a wage notice setting forth her rate of pay and basis thereof, exempt status, overtime rate, method of compensation, regular payday, names of her employers (including fictitious names), addresses and phone numbers for her employers' main offices or principal locations, or any allowances taken.

404.    For the duration of Plaintiff's employment with Defendants, Defendants failed to furnish Plaintiff with an accurate and complete statement, with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

405.    Defendants impermissibly and unlawfully deducted monies from Plaintiff's wages.

406.    Defendants knowingly and willfully violated the FLSA and NYLL with respect to Plaintiff's employment.

### FIRST CAUSE OF ACTION
### Title VII – National Origin Discrimination
### On Behalf of Plaintiff and the Title VII Collective
### (As to Nurtury Defendants only)

407.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

408.    By the actions described above, among others, Defendants have discriminated against Plaintiff and the Title VII Collective because of their national origin, in violation of Title VII.

409.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff and the Title VII Collective have suffered and continues to suffer harm, for which they are entitled to an award of monetary damages and other relief.

**SECOND CAUSE OF ACTION**
**NYSHRL – National Origin Discrimination**
**On Behalf of Plaintiff and the Rule 23 NYSHRL Class**
**(As to all Defendants)**

410.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

411.    By the actions described above, among others, Defendants have discriminated against Plaintiff and the Rule 23 NYSHRL Class as a result of their national origin, in violation of the NYSHRL.

412.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff and the Rule 23 NYSHRL Class have suffered and continues to suffer harm, for which they are entitled to an award of monetary damages and other relief.

**THIRD CAUSE OF ACTION**
**Title VII – National Origin-Based Hostile Work Environment**
**On Behalf of Plaintiff and the Title VII Collective**
**(As to Nurtury Defendants only)**

413.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

414. By the actions described above, among others, Defendants have discriminated against Plaintiff and the Title VII Collective and subjected Plaintiff and the Title VII Collective to a hostile work environment because their national origin, in violation of Title VII.

415. As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff and the Title VII Collective have suffered and continues to suffer harm, for which they are entitled to an award of monetary damages and other relief.

<u>FOURTH CAUSE OF ACTION</u>
**NYSHRL – National Origin-Based Hostile Work Environment**
**On Behalf of Plaintiff and the Rule 23 NYSHRL Class**
**(As to all Defendants)**

416. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

417. Prior to October 11, 2019, Executive Law § 296 provided for a hostile work environment claim where an employee showed that his or her work environment involved severe or pervasive harassment… of such quality or quantity that a reasonable employee would find the conditions of his or her employment altered for the worse.

418. Effective October 11, 2019, Executive Law § 296 was amended to lower the standard for a hostile work environment claim to require only a showing of, "inferior terms, conditions or privileges of employment because of the individual's membership in one or more . . . protected categories."

419. Defendants subjected Plaintiff and the Rule 23 NYSHRL Class to severe and pervasive harassment based on their national origin and inferior terms, conditions, and privileges of employment because of Plaintiff's and the Rule 23 NYSHRL Class's national origin to create a hostile work environment under both standards.

420.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff and the Rule 23 NYCHRL Class have suffered and continues to suffer harm, for which they are entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**Title VII – Sex/Gender-Based Discrimination**
**On Behalf of Plaintiff**
**(As to Nurtury Defendants only)**

421.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

422.    By the actions described above, among others, Defendants have discriminated against Plaintiff because of her sex/gender, in violation of Title VII.

423.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm, for which she is entitled to an award of monetary damages and other relief.

**SIXTH CAUSE OF ACTION**
**NYSHRL – Sex/Gender-Based Discrimination**
**On Behalf of Plaintiff**
**(As to all Defendants)**

424.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

425.    By the actions described above, among others, Defendants have discriminated against Plaintiff as a result of her sex/gender, in violation of the NYSHRL.

426.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm, for which she is entitled to an award of monetary damages and other relief.

**SEVENTH CAUSE OF ACTION**
**Title VII – Sex/Gender-Based Hostile Work Environment**

**On Behalf of Plaintiff**
**(As to Nurtury Defendants only)**

427.   Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

428.   By the actions described above, among others, Defendants have discriminated against Plaintiff and subjected Plaintiff to a hostile work environment because of her sex/gender, in violation of Title VII.

429.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm, for which she is entitled to an award of monetary damages and other relief.

**<u>EIGHTH CAUSE OF ACTION</u>**
**NYSHRL – Sex/Gender-Based Hostile Work Environment**
**On Behalf of Plaintiff and the Rule 23 NYSHRL Class**
**(As to all Defendants)**

430.   Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

431.   Prior to October 11, 2019, Executive Law § 296 provided for a hostile work environment claim where an employee showed that his or her work environment involved severe or pervasive harassment… of such quality or quantity that a reasonable employee would find the conditions of his or her employment altered for the worse.

432.   Effective October 11, 2019, Executive Law § 296 was amended to lower the standard for a hostile work environment claim to require only a showing of, "inferior terms, conditions or privileges of employment because of the individual's membership in one or more . . . protected categories."

433.    Defendants subjected Plaintiff to severe and pervasive harassment based her sex/gender and inferior terms, conditions, and privileges of employment because of Plaintiff's sex/gender to create a hostile work environment under both standards.

434.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm, for which she is entitled to an award of monetary damages and other relief.

**NINTH CAUSE OF ACTION**
**Title VII – Retaliation**
**On Behalf of Plaintiff**
**(As to Nurtury Defendants only)**

435.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

436.    By the actions described above, among others, Defendants have retaliated against Plaintiff for engaging in protected activity by, *inter alia*, refusing to remediate the discrimination and harassment of which she complained—including Defendants' unlawful pay practices, threatening Plaintiff with police action, requiring Plaintiff to pay the balance of her Montessori training tuition, and ultimately forcing Plaintiff to accept her constructive termination, in violation of Title VII.

437.    As a direct and proximate result of Defendants' unlawful discriminatory and retaliatory conduct, Plaintiff has suffered and continues to suffer harm, for which she is entitled to an award of monetary damages and other relief.

**TENTH CAUSE OF ACTION**
**NYSHRL – Retaliation**
**On Behalf of Plaintiff**
**(As to all Defendants)**

438.   Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

439.   By the actions described above, among others, Defendants have retaliated against Plaintiff for engaging in protected activity by, *inter alia*, refusing to remediate the discrimination and harassment of which she complained—including Defendants' unlawful pay practices, threatening Plaintiff with police action, requiring Plaintiff to pay the balance of her Montessori training tuition, and ultimately forcing Plaintiff to accept her constructive termination, in violation of NYSHRL.

440.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm, for which she is entitled to an award of monetary damages and other relief.

### ELEVENTH CAUSE OF ACTION
**FLSA – Unpaid Minimum Wages**
**On Behalf of Plaintiff and the FLSA Collective**
**(As to all Defendants)**

441.   Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

442.   Defendants were required to pay Plaintiff and the FLSA Collective the applicable federal minimum wage rate for all hours worked.

443.   Defendants failed to pay Plaintiff and the FLSA Collective the minimum wages to which they are entitled under the FLSA.

444.   Defendants were aware or should have been aware that the practices described in this Complaint were unlawful and have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff and the FLSA Collective.

445.　Defendants' violations of the FLSA described above have been willful and therefore, a three-year statute of limitations applies to this matter pursuant to the FLSA, 29 U.S.C. § 255(a).

446.　As a result of Defendants' willful violations of the FLSA, Plaintiff and the FLSA Collective are entitled to recover from Defendants their unpaid minimum wages, liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to 29 U.S.C. § 216(b).

## TWELFTH CAUSE OF ACTION
### NYLL – Unpaid Minimum Wages
### On Behalf of Plaintiff and the Rule 23 NYLL Class
### (As to all Defendants)

447.　Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

448.　Defendants failed to pay Plaintiff and the Rule 23 NYLL Class the minimum wages to which they are entitled under the NYLL.

449.　Defendants have willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiff and the Rule 23 NYLL Class minimum hourly wages for all hours worked.

450.　As a result of Defendants' willful violations of the NYLL, Plaintiff and the Rule 23 NYLL Class are entitled to recover from Defendants their unpaid minimum wages, liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to NYLL §§ 663(1), *et seq.*

## THIRTEENTH CAUSE OF ACTION
### FLSA – Unpaid Overtime Wages
### On Behalf of Plaintiff and the FLSA Collective
### (As to all Defendants)

451.　Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

452.    Defendants are employers within the meaning of 29 U.S.C §§ 203(e) and 206(a) and employed Plaintiff.

453.    Defendants were required to pay Plaintiff and the FLSA Collective one and one-half (1 ½) times the regular rate of pay/applicable minimum wage rate for all hours worked in excess of 40 hours in a workweek.

454.    Defendants failed to pay Plaintiff and the FLSA Collective the overtime wages to which they were entitled under the FLSA.

455.    Defendants willfully violated the FLSA by knowingly and intentionally failing to pay Plaintiff and the FLSA Collective overtime wages.

456.    Defendants' violations of the FLSA described above have been willful, and therefore, a three-year statute of limitations applies to this matter pursuant to the FLSA, 29 U.S.C. § 255(a).

457.    As a result of Defendants' willful violations of the FLSA, Plaintiff and the FLSA Collective are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to 29 U.S.C. § 216(b).

**FOURTEENTH CAUSE OF ACTION**
**NYLL – Unpaid Overtime Wages**
**On Behalf of Plaintiff and the Rule 23 NYLL Class**
**(As to all Defendants)**

458.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

459.    Under the NYLL and supporting New York State Department of Labor Regulations, Defendants were required to pay Plaintiff and other non-exempt employees one and one half (1 ½) times the regular rate of pay/applicable minimum wage rate for all hours they worked in excess of forty (40) hours per week.

460.    Defendants failed to pay Plaintiff and the Rule 23 NYLL Class the overtime wages to which they were entitled under the NYLL.

461.    Defendants willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiff and the Rule 23 NYLL Class overtime wages.

462.    As a result of Defendants willful violations of the NYLL, Plaintiff and the Rule 23 NYLL Class are entitled to recover their unpaid overtime wages, liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to NYLL §§ 663(1), *et seq*.

**FIFTEENTH CAUSE OF ACTION**
**FLSA – Record Keeping Violations**
**On Behalf of Plaintiff and the FLSA Collective**
**(As to all Defendants)**

463.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

464.    Pursuant to the FLSA, Defendants are required to keep and maintain employee payroll records reflecting, *inter alia*, the hours worked and pay received by each employee, for at least three years, and records on which employee wage computations are based for at least two years.

465.    Defendants failed to maintain complete and accurate records of, *inter alia*, the hours worked and pay received by Plaintiff and the FLSA collective.

466.    As such, Defendants are in violation of the FLSA's record keeping requirements.

**SIXTEENTH CAUSE OF ACTION**
**NYLL – Record Keeping Violations**
**On Behalf of Plaintiff and the Rule 23 NYLL Class**
**(As to all Defendants)**

467.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

468.   At all times relevant to this action, Defendants were and are required to establish, maintain, and preserve for not less than six years, weekly payroll records that show for each employee, among other information, true and accurate payroll records and the number of hours worked daily and weekly, including the time of arrival and departure of each employee. NYLL § 195(4); 12 N.Y.C.R.R. § 142-2.6.

469.   Defendants violated the applicable NYLL and NYCRR provisions by not maintaining and preserving payroll records and all of the hours worked of Plaintiff and the Rule 23 NYLL Class.

**SEVENTEENTH CAUSE OF ACTION**
**NYLL – Unpaid Spread-of-Hours Pay**
**On Behalf of Plaintiff and the Rule 23 NYLL Class**
**(As to all Defendants)**

470.   Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

471.   Defendants have willfully failed to pay Plaintiff and the Rule NYLL 23 Class additional compensation of one hour's pay at the minimum hourly wage rate in all instances where Plaintiff and the Rule 23 NYLL Class worked either a split shift or more than 10 hours per day, in violation of NYLL §§ 650, *et seq.* and the regulations promulgated thereunder including N.Y. Comp. Code R. & Regs. Tit. 12 §§, 137-1.7 (2010), 146-1.6 (2012).

472.   As a result of Defendants willful violations of the NYLL, Plaintiff and the Rule 23 NYLL Class are entitled to recover unpaid spread-of-hours compensation, liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to the NYLL.

**EIGHTEENTH CAUSE OF ACTION**
**NYLL – Wage Theft Prevention Act Notice Violations**
**On Behalf of Plaintiff and the Rule 23 NYLL Class**

**(As to all Defendants)**

473.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

474.    NYLL § 195(1)(a) obligates every employer to: "provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary. Each time the employer provides such notice to an employee, the employer shall obtain from the employee a signed and dated written acknowledgement, in English and in the primary language of the employee, of receipt of this notice, which the employer shall preserve and maintain for six years."

475.    Defendants failed to provide Plaintiff and the Rule 23 NYLL Class with wage notices compliant with NYLL § 195(1)(a).

476.    Due to Defendants' violations of NYLL § 195(1), Plaintiff and the Rule 23 NYLL Class are each entitled to statutory penalties of $50.00 for each workday that Defendants failed to provide wage notices, up to a maximum of $5,000 each, reasonable attorneys' fees, costs and injunctive and declaratory relief, as provided by NYLL § 198(1-b)

477.    Defendants violated NYLL § 195(3) by failing to furnish Plaintiff and the Rule 23 NYLL
Class with each payment of wages and accurate statement listing the dates of work covered by
that payment or wages; name of employee; name of employer; address and phone number of
employer; rate of rates of pay and basis thereof, whether paid by the hour, shift, day, week,
salary, piece, commission, or other; the regular hourly rate or rates of pay; the overtime rate or
rates of pay; the number of regular hours worked, and the number of overtime hours worked;
gross wages, deductions, allowances, if any, claimed as part of the minimum wage; and net
wages.

478.    Through their failure to provide Plaintiff and the Rule 23 NYLL Class with wage
statements as required by the NYLL, Defendants have violated NYLL § 190, *et seq*. and the
supporting New York State Department of Labor Regulations.

479.    Due to Defendants' violations of NYLL § 195(3), Plaintiff and the Rule 23 NYLL Class
are each entitled to statutory penalties of $250.00 for each workweek that Defendants failed to
provide them with accurate wage statements, or a total of $5,000 each, plus reasonable
attorneys' fees, costs and injunctive and declaratory relief, as provided for by NYLL § 198(1-
d).

<u>**NINETEENTH CAUSE OF ACTION**</u>
**FLSA – Retaliation**
**On Behalf of Plaintiff**
**(As to all Defendants)**

480.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said
paragraphs were more fully set forth herein at length.

481.    Plaintiff was an employee of Defendants within the meaning of the FLSA.

482.    Defendants were employers of Plaintiff within the meaning of the FLSA.

483.    29 U.S.C. § 215(a)(3) prohibits any person, "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

484.    While employed by Defendants, Plaintiff complained to Defendant about Defendants' unlawful employment practices, including Defendants' failure to pay Plaintiff the minimum wage for all hours worked, to pay her timely, and Defendants' unlawful deduction of her wages.

485.    Plaintiff's complaints constitute protected activity under the FLSA.

486.    After and as a result of Plaintiff's complaints, Plaintiff was forced to accept her constructive termination from Defendants.

487.    A causal connection exists between Plaintiff's complaints of Defendants' unlawful pay practices and Plaintiff's forced acceptance of her constructive termination.

488.    Defendants violated 29 U.S.C. § 215(a)(3) by, *inter alia*, forcing Plaintiff to accept her constructive termination in retaliation for Plaintiff's complaints of Defendants' unlawful pay practices.

489.    Due to Defendants' violations of 29 U.S.C. § 215(a)(3), Plaintiff is entitled to recover her lost wages and other compensatory damages, liquidated damages in an amount equal to her lost wages, pre-judgment and post-judgment interest, along with reasonable attorneys' fees, costs and injunctive and declaratory relief.

**TWENTIETH CAUSE OF ACTION**
**NYLL – Retaliation**
**On Behalf of Plaintiff**
**(As to all Defendants)**

490.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

491.    Plaintiff was an employee of Defendants within the meaning of the NYLL.

492.    Defendants are employers of Plaintiff within the meaning of the NYLL.

493.    NYLL § 215(1) states, in part, "No employer or his or her agent, or the officer of agent of any corporation, partnership, or limited liability company…shall discharge, threaten, penalize or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer…or his or her authorized representative…that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…[or] (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter…or (v) because such employee has otherwise exercised rights protected under this chapter…"

494.    While employed by the Defendants, Plaintiff complained to the Defendants about Defendants' unlawful practices, policies and procedures of not being paid proper wages, including Defendants' failure to pay Plaintiff the minimum wage for all hours worked, to pay her timely, and Defendants' unlawful deduction of her wages.

495.    Plaintiff's complaints to Defendants constitute protected activity under NYLL § 215.

496.    A causal connection exists between Plaintiff's complaints of improper pay practices and Plaintiff's forced acceptance of her constructive termination.

497.    Defendants violated NYLL § 215 by retaliating against Plaintiff by terminating her employment due to her complaints about Defendants' unlawful pay practices, policies and

procedures, including Defendants' failure to pay Plaintiff the minimum wage for all hours worked, to pay her timely, and Defendants' unlawful deduction of her wages.

498.    Due to Defendants' violations NYLL § 215, Plaintiff is entitled to recover her lost wages and other compensatory damages, liquidated damages, pre-judgment and post-judgment interest, along with reasonable attorneys' fees, costs and injunctive and declaratory relief.

**TWENTY-FIRST CAUSE OF ACTION**
**FFCRA/EPSLA – Failure to Provide Paid Quarantine Sick Leave**
**On Behalf of Plaintiff**
**(As to all Defendants)**

499.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

500.    The EPSLA, a provision of the FFCRA, requires an employer to provide 80 hours of paid sick leave to a full-time employee quarantining due to Coronavirus related conditions including, *inter alia*, because the employee is subject to a Federal, state, or local quarantine or isolation order related to Coronavirus.

501.    Pursuant to the EPSLA, an employer who fails to provide mandatory Coronavirus paid leave is deemed to have failed to pay the employee the minimum wage pursuant to the Fair Labor Standards Act ("FLSA") and subject to the enforcement provisions and penalties of the FLSA.

502.    By the actions described above, among others, Defendants willfully failed to provide Plaintiff 80 hours of paid sick leave taken as a result of his being subject to a Federal, state, or local quarantine or isolation order related to Coronavirus.

503.    Due to Defendants failure to provide Plaintiff with the full amount of Coronavirus-related paid sick leave to which she was entitled, Defendants have failed to pay Plaintiff the minimum wage and have violated the FFCRA and EPSLA.

504.    As a result of Defendants' willful violations of the FFCRA and EPSLA, Plaintiff is entitled

to recover from Defendant her unpaid minimum wages, liquidated damages, pre-judgment

interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action

pursuant to 29 U.S.C. § 216(b).

## TWENTY-SECOND CAUSE OF ACTION
### FFCRA/EPSLA – Retaliation
### On Behalf of Plaintiff
### (As to all Defendants)

505.    Plaintiff repeats, realleges, and restates each and every paragraph above as if said

paragraphs were more fully set forth herein at length.

506.    The EPSLA prohibits an employer from discharging, disciplining, or discriminating

against any employee who takes leave pursuant to the FFCRA or EPSLA or who has filed any

complaint or caused to be instituted any proceeding under or related to the FFCRA or EPSLA.

507.    Pursuant to the EPSLA, an employer who willfully retaliates against an employee for

asserting their rights under the FFCRA or EPSLA is deemed in violation of and subject to the

penalties set forth in the anti-retaliation provisions of the FLSA.

508.    By the actions described above, among others, Defendants willfully retaliated against

Plaintiff by, *inter alia*, forcing her to accept her constructive termination after she complained

of Defendants' unlawful failure to provide him with 80 hours of paid sick leave to comply with

a Federal, state, or local quarantine or isolation order related to Coronavirus.

509.    As a result of Defendants' retaliatory conduct, Plaintiff is entitled to recover from

Defendants lost wages and other compensatory damages and liquidated damages an amount

equal to her lost wages, in addition to reasonable attorneys' fees, costs, declaratory and

injunctive relief.

## INJURY AND DAMAGES

510.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss and/or partial loss of a career and the loss and/or partial loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses, and other economic damages, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, injury to reputation, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiff has further experienced severe emotional and physical distress.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Title VII Collective, Rule 23 NYSHRL Class, FLSA Collective and Rule 23 NYLL Class, respectfully requests that this Court grant the following relief:

A.  Designating this action as a collective action on behalf of the Title VII Collective and ordering the prompt issuance of notice to all similarly situated employees of non-American national origin, including Assistant Teachers and Teachers, and appointing Plaintiff and her counsel to represent the Title VII Collective.  Such notice shall inform them that this civil action has been filed, the nature of the action, and their right to join this lawsuit if they believe they were discriminated against or subjected to a hostile work environment because of their status as individuals of non-American national origin;

B.  Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Rule 23 NYSHRL Class and appointing Plaintiff and her counsel to represent the class;

C.  Designating this action as a collective action on behalf of the FLSA Collective and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated non-exempt employees, and appointing Plaintiff and her counsel to represent the FLSA Collective.  Such notice shall inform them that this civil action has been filed, the nature of the action, and their right to join this lawsuit if they believe they were denied proper wages;

D.  Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Rule 23 NYLL Class and appointing Plaintiff and her counsel to represent the class;

E.   Issuing an order tolling the statute of limitations;

F.   Issuing a declaratory judgment that the practices complained of herein are unlawful under applicable state and federal law;

G.   Issuing an injunction restraining Defendants from subjecting their employees to discriminatory and hostile conduct on the basis of national origin and sex/gender;

H.   Directing Defendants to place Plaintiff, the Title VII Collective, and the Rule 23 NYSHRL Class in the in the position they would have occupied but for Defendants' discriminatory and otherwise unlawful conduct and making Plaintiff, the Title VII Collective, and the Rule 23 NYSHRL Class whole for all earnings and other benefits they would have received but for Defendants' discriminatory and unlawful treatment, including, but not limited to, title, seniority status, wages and other lost benefits;

I.   Awarding Plaintiff, the Title VII Collective, and the Rule 23 NYSHRL Class compensatory monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, and other benefits of employment, incurred as of result of Defendants' violations of Title VII and the NYSHRL, in an amount to be determined at trial;

J.   Awarding Plaintiff, the Title VII Collective, and the Rule 23 NYSHRL Class compensatory non-monetary and/or non-economic damages, including but not limited to compensation for mental anguish, humiliation, embarrassment, stress and anxiety, emotional and psychological pain and suffering, emotional and psychological distress and the physical manifestations caused, incurred as a result of Defendants' violations of Title VII and the NYSHRL, in an amount to be determined at trial;

K.   Awarding Plaintiff, the Title VII Collective, and the Rule 23 NYSHRL Class punitive damages for Defendants' violations of Title VII and the NYSHRL;

L.   Issuing an injunction restraining Defendants from subjecting their employees to the unlawful pay practices complained of herein;

M.   Declaring that Defendants' violations of the FLSA and NYLL were willful;

N.   Awarding Plaintiff, the FLSA Collective, and the Rule 23 NYLL Class unpaid minimum wages;

O.   Awarding Plaintiff, the FLSA Collective, and the Rule 23 NYLL Class unpaid overtime wages;

P.   Awarding Plaintiff and the Rule 23 NYLL Class spread-of-hours pay;

Q. Awarding Plaintiff, the FLSA Collective, and the Rule 23 NYLL Class liquidated and/or punitive damages in amount equal to the total amount of wages found to be due, pursuant to the FLSA and NYLL;

R. Awarding Plaintiff and the Rule 23 NYLL Class statutory penalties for Defendants failure to furnish wage notices and/or pay statements pursuant to the NYLL;

S. Declaring Defendants' violations of the FFCRA, EPSLA, and supporting regulations were willful;

T. Awarding Plaintiff compensatory damages as a result of Defendants' violations of the FFCRA, EPSLA, and supporting regulations;

U. Awarding Plaintiff liquidated and/or punitive damages as a result of Defendants violations of the FFCRA, EPSLA, and supporting regulations;

V. Declaring that Defendants retaliated against Plaintiff by, *inter alia*, forcing her to accept her constructive termination due to her complaints of, and opposition to, Defendants' unlawful pay practices, policies and procedures, and awarding Plaintiff a recovery for compensatory and liquidated/punitive damages sustained;

W. Awarding Plaintiff, the Title VII Collective, and the Rule 23 NYSHRL Class reasonable attorney's fees, costs, and expenses of the action under Title VII and the NYSHRL;

X. Awarding Plaintiff, the FLSA Collective, and the Rule 23 NYLL Class reasonable attorney's fees, costs, and expenses of the action under the FLSA and NYLL;

Y. Awarding Plaintiff, the Title VII Collective, and the Rule 23 NYSHRL Class pre-judgment and post-judgement interest, retroactive to the date the damages accrued, under Title VII and the NYSHRL;

Z. Awarding Plaintiff, the FLSA Collective, and the Rule 23 NYLL Class pre-judgment and post-judgement interest, retroactive to the date the damages accrued, under the FLSA and NYLL; and

AA.    Awarding such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated:  June 9, 2022
        New York, New York

Respectfully submitted,

**Akin Law Group PLLC**

*/s/ Justin Ames*
_____
Justin Ames

45 Broadway, Suite 1420
New York, NY 10006
Telephone:  (212) 825-1400
Facsimile:  (212) 825-1440
justin@akinlaws.com

*Counsel for Plaintiff*